1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

11

UNION PACIFIC RAILROAD
COMPANY,

CASE NO. 3:22-cv-05544-TL

12

Plaintiff,

ORDER GRANTING MOTION TO
DISMISS

13

v.

14

DAVID W DANNER, in his official
capacity as Chair of the Washington
Utilities and Transportation Commission, et
al.,

15
16

Defendants.

17

18         Plaintiff Union Pacific Railroad Company ("UPRR") brings this action to enjoin

19   Defendants David Danner, Ann Rendahl, and Milt Doumit—all Commissioners of the

20   Washington Utilities and Transportation Commission (collectively, "WUTC" or "the

21   Commission")—from enforcing an administrative order allocating costs to UPRR for the

22   ongoing maintenance of safety equipment installed using federal funds at a highway-rail grade

23   crossing in Spokane Valley, Washington, pursuant to Washington (the "State") statute RCW

24   81.53.295. This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's

Amended Complaint. Dkt. No. 18. Having considered the relevant record and heard oral

argument, the Court FINDS that RCW 81.53.295 is not preempted as a matter of law, nor does it

violate due process. The Court therefore GRANTS Defendants' Motion to Dismiss.

## I.    BACKGROUND

### A.    Barker Road Corridor Improvement Project

Barker Road runs through the city of Spokane Valley ("the City"), connecting Interstate

Highway 90 and State Highway 290, and includes a rail grade crossing intersecting a section of

track owned by UPRR. Dkt. No. 14 ¶ 13; Dkt. No. 14-3 at 3.[1] In response to a State

Environmental Policy Act analysis conducted for its 2016 Comprehensive Plan update, the City

chose to prioritize an improvement project along the Barker Road corridor ("Barker Road

project") using the Federal Highway Administration Systemic Safety Project Selection Tool.

Dkt. No. 14-2 ¶ 11. Part of the Barker Road project includes significant modifications to the rail

grade crossing at issue here. *Id.* ¶¶ 5–11. These modifications include installation of upgraded

safety signals and warning devices as recommended by a diagnostic team that included UPRR

representatives, which evaluated conditions at the crossing to determine safety issues for the City

to consider in designing the improvement project. Dkt. No. 14-3 at 4–5. The City intends to use

$841,464 in federal funding to complete the rail grade crossing portion of the project. Dkt.

No. 14-2 ¶ 10. The City worked with UPRR to negotiate a Construction and Maintenance

Agreement ("CMA") to implement the proposed portion of the project that impacted the rail

---

[1] On a motion to dismiss, a court typically considers only the contents of the complaint. However, a court is permitted to take judicial notice of facts that are included in documents and material that are directly attached to or otherwise incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."). Here, UPRR attached to and referenced in its Complaint materials from the hearing before the Commission, include the ALJ's orders and prefiled sworn testimony from UPRR witnesses. Further, the plain language of the relevant statutes and published regulations are heavily referenced in the complaint and are otherwise judicially noticeable. *See* Fed. R. Evid. 201(b)(2).

1    grade crossing. Dkt. No. 14-4 at 3. Negotiations broke down because the City would not agree to

2    pay UPRR $8,760 annually (*i.e.*, the entire anticipated cost of the annual maintenance, Dkt.

3    No. 14-4 at 5) as part of UPRR's proposed maintenance fee provision. Dkt. No. 14-2 ¶ 14.

4    **B.    Proceedings Before the Commission**

5           After failing to reach a private agreement with UPRR, the City petitioned the

6    Commission in 2021 for authorization and funding to install the proposed modified safety signals

7    and warning devices as part of the rail grade crossing portion of the project. Dkt. No. 14-1 ¶ 1.

8    Separately, the City filed a complaint with the Commission seeking an order allocating the costs

9    of ongoing maintenance of the modified safety devices to UPRR once installed. *Id.* The two

10   requests were consolidated to be heard in a quasi-judicial proceeding overseen by an

11   Administrative Law Judge ("ALJ"). *Id.* ¶ 10 (citing WAC 480-07-320). UPRR moved to dismiss

12   the proceedings by (1) challenging the constitutionality of the Commission's authority to grant

13   the City's requests under the Commerce and Due Process Clauses of the Constitution,

14   (2) claiming the State statute is preempted by the Interstate Commerce Commission Termination

15   Act ("ICCTA"), and (3) arguing that the City failed to sufficiently allege facts to state a claim on

16   the underlying merits of the requests. *Id.* ¶ 11. The ALJ denied UPRR's motion to dismiss.

17   *Id.* ¶¶ 11–29. Specifically, the ALJ found that it lacked authority to decide UPRR's Commerce

18   Clause and due process challenges, the governing statute was not pre-empted by the ICCTA, and

19   the City plausibly stated a claim for the relief requested. *Id.*

20          An evidentiary hearing was scheduled. Dkt. No. 14-2 ¶ 2. The City and UPRR filed pre-

21   sworn witness testimony before the hearing. Dkt. No. 14-2 ¶¶ 4, 12, 16, 18.[2] UPRR, the City,

22   and Commission staff appeared before the ALJ at the hearing. *Id.* ¶ 20. UPRR and the City

23

24   ───────────────────
     [2] UPRR's rebuttal testimony was struck as procedurally improper. Dkt. No. 14-2 ¶ 18–19.

ORDER GRANTING MOTION TO DISMISS - 3

proffered witnesses and conducted cross-examination at the hearing (*id.*), and the Parties and Commission staff then filed post-hearing briefs (*id.* ¶ 21).

Ultimately, the ALJ granted the City's petition to install upgraded safety devices at the rail grade crossing on the merits and ordered UPRR to pay all ongoing maintenance costs for the devices after installation. Dkt. No. 14-2 ¶¶ 58–66. In making its findings and conclusions, the ALJ considered the sworn testimony of UPRR witnesses (including those attached to its Amended Complaint) regarding its involvement in the design of the rail-grade crossing project, its efforts to negotiate a private agreement with the city, its understanding of the overall purpose for the proposed modifications, and the impact the modifications would have on the railroad. Dkt. No. 14-2 ¶¶ 12–15, 17–20. The ALJ also considered the parties' arguments in their respective post-hearing briefs, including UPRR's contention (among others) that public safety did not require the modification of safety devices as part of the rail grade crossing project and that relevant law requires that the apportionment of maintenance costs be reasonable under the circumstances of the specific case. *Id.* ¶¶ 27–28. The ALJ also considered counter arguments provided by the City and by Commission staff that addressed, among other issues, the benefit (or lack thereof) of the modifications for the railroad. *Id.* ¶¶ 22–24, 30–33. The ALJ found the City established that public safety required installation of the upgraded signals and other warning devices at the rail grade crossing. *Id.* at ¶ 34.

The administrative procedures of the Commission allow for an ALJ's order to be administratively reviewed upon application by any party within 20 days of issuance before the order becomes final. *See* Dkt. No. 14-2 at 18 (citing WAC 480-07-825, -830, and RCW 80.01.060). The regulations further authorize judicial review of the ALJ's orders in state court. *See* RCW 81.53.170. There is no indication from the Parties that anyone ever sought administrative or judicial review of the ALJ's orders in this case. Thus, the ALJ's orders on the

City's petition and complaint became final upon the expiration of the 20-day deadline for

seeking review. *See* RCW 80.01.060.

**C.      Federal Court Proceedings**

The ALJ issued an order on the consolidated petition and complaint on June 7, which

became final on June 27, 2022. Dkt. No. 14-2 at 17–18. The day the order became final, UPRR

filed this action against Defendants in their official capacities as WUTC Commissioners. *See*

Dkt. No. 1. In its initial Complaint, UPRR reasserted its (1) ICCTA preemption, (2) Commerce

Clause, and (3) facial due process claims, in addition to (4) a new as-applied due process claim,

and (5) new preemption claims under the Federal Highway Administration's ("FHWA")

authorizing statutes and published regulations.[3] *See id.* ¶¶ 16–44. After the Commission moved

to dismiss the initial Complaint (Dkt. No. 13), UPRR filed an amended Complaint ("FAC," Dkt.

No. 14), which dropped the ICCTA preemption and Commerce Clause claims (*compare* Dkt.

No. 14 ¶¶ 17–37 *with* Dkt. No. 1 ¶¶ 16–44). *See also* Dkt. No. 20 at 19 n.4.

In the FAC, UPRR now seeks to enjoin the Commission's order by requesting a

declaration that RCW 81.53.295 (Count I), which requires the Commission to impose the

challenged maintenance costs, and the Commission's order (Count II) are either expressly or

impliedly preempted by FHWA regulations, and that the statute and order are unconstitutional

because they violate due process either facially or as applied under the specific circumstances of

this case (Count III). Dkt. No. 14 ¶¶ 17–37; *id.* at 9 (¶¶ A–C).

---

[3] UPRR did not include the FHWA regulatory preemption claim in its motion to dismiss the administrative proceedings. *See* Dkt. Nos. 14-1, 14-2. Instead, it claims that it made the arguments in post-hearing briefing and that the arguments were never addressed by the ALJ. Dkt. No. 14 ¶ 16. The ALJ's order notes that it considered the new arguments as an untimely collateral attack of its order on the motion to dismiss but that, in any event, the Commission rejected UPRR's claim that federal law preempted RCW 81.53.295. Dkt. No. 14-2 ¶ 40. As such, the Court considers these claims as asserted for the first time for purposes of this motion.

The Commission again moves to dismiss all of UPRR's claims per Federal Rule of Civil Procedure ("FRCP") 12(b)(6). Dkt. No. 18. UPRR responded in opposition (Dkt. No. 20), and the Commission replied (Dkt. No. 21). The Commission also filed a notice of supplemental authority (Dkt. No. 22) pursuant to Local Civil Rule 7(n). The Court subsequently allowed additional briefing on the supplemental authority (*see* Dkt. No. 24), including UPRR's sur-response (Dkt. No. 23) and the Commission's sur-reply (Dkt. No. 25). On August 15, 2023, the Court heard oral argument from the Parties on the motion. Dkt. No. 28. Defendants filed a notice of supplemental authority providing a February 2016 FHWA guidance document (Guidance on Highway Preservation and Maintenance) referenced at oral argument as ordered by the Court. Dkt. No. 29. Pursuant to Federal Rule of Evidence 201(b)(2), the Court takes judicial notice of the supplemental authority.

## II.   LEGAL STANDARDS

Defendant brings this motion to dismiss for failure to state a claim under FRCP 12(b)(6). Dkt. No. 18 at 4. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a FRCP 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To survive a motion to dismiss . . . , [a plaintiff's] factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013). "[T]he tenet that a court must accept as true all

1   of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S.

2   at 678 (citing *Twombly*, 550 U.S. at 555).

3                              **III.   DISCUSSION**

4          Defendants move to dismiss the FAC in its entirety, arguing that UPRR cannot state a

5   claim for relief for any of its causes of action as a matter of law. Dkt. No. 18 at 2. Specifically,

6   Defendants argue that RCW 81.53.295 is not preempted by FHWA regulations that expressly

7   preempt state laws that allocate construction costs to the railroads for highway-rail grade

8   crossing projects utilizing federal highway-aid funds because the regulation applies only to

9   construction projects and not ongoing maintenance costs. *Id.* at 5–10. Further, if RCW 81.53.295

10  is not preempted, then the Commission's order based on that statute is also not preempted. *Id.*

11  Finally, Defendants argue that the United States Supreme Court has already determined that state

12  laws such as RCW 81.53.295 do not violate due process. *Id.* at 10–12.

13  **A.    RCW 81.53.295 and the Commission's Order Are Not Preempted**

14         Pursuant to the Supremacy Clause of the Constitution, "[s]tate law can be preempted by

15  constitutional text, by federal statute, or by a federal regulation." *MetroPCS Cal., LLC v. Picker*,

16  970 F.3d 1106, 1117 (9th Cir. 2020) (citing *P.R. Dep't of Consumer Affs. v. Isla Petroleum*

17  *Corp.*, 485 U.S.495, 503 (1988)). To have preemptive force, (1) the agency must have intended

18  to displace the state law in question, and (2) a federal regulation must be within the scope of the

19  federal agency's delegated authority. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S.

20  141, 154 (1982); *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022), *cert. denied*, 143 S.

21  Ct. 2513 (2023) (mem.). A court first analyzes whether the federal agency meant to preempt the

22  state law, and, if so, then analyzes whether the scope of the federal agency's delegated authority

23  includes the power to preempt the state law. *See Fidelity Fed. Sav. & Loan Ass'n,* 458 U.S.

24  at 154 ("[T]he questions upon which resolution of this case rests are whether the [agency] meant

to pre-empt [state] law, and, if so, whether that action is within the scope of the [agency's] delegated authority").

The agency's intention may be either express or implied. *Id.; see also MetroPCS*, 970 F.3d at 1117–18. Express preemption occurs when the text of a federal statute or regulation "explicitly manifests [an] intent to displace state law." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022) (internal quotation marks omitted) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)*, cert. denied*, 143 S. Ct. 2493 (2023) (mem.)).

Preemption can also be implied where state law "actually conflicts with federal law," known as "conflict preemption."[4] *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153. Conflict preemption "arises when compliance with both federal and state regulations is a physical impossibility . . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted); *see also Cohen*, 46 F.4th at 1028. The two "cornerstones" of any implied preemption analysis are: (1) the congressional purpose of the allegedly preemptive enactment, and (2) the assumption that the states' historic police powers are not preempted without a "clear and manifest" congressional purpose. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (internal quotation marks and citations omitted).

Determining whether a state statute is preempted is an exercise in statutory construction to determine congressional intent (*id.* at 1211–12), which is a question of law for the Court. *See*

---

[4] A second form of implied preemption, known as "field preemption," has been recognized by federal courts but is not at issue in this case, and will therefore not be addressed. *See, e.g.*, *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153.

*United States v. Stephens*, 237 F.3d 1031, 1033 (9th Cir. 2001) ("[P]roper interpretation of a statute is a question of law."). Therefore, the Court need not accept as true assertions in the FAC regarding statutory interpretation or congressional intent because they are legal conclusions. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

For the reasons stated below, the Court FINDS that RCW 81.53.295, and by extension the Commission's order, are not preempted by the FHWA regulations as a matter of law.

1. **Express Preemption**

UPRR asserts that 23 C.F.R. §§ 646.210(a) and (b)(1) expressly preempt the maintenance allocation language in RCW 81.53.295, and by extension the ALJ's order. Dkt. No. 14 ¶¶ 18–31. In the FAC, UPRR's first cause of action asserts that FHWA regulations at 23 C.F.R. § 646.210 *et. seq.* expressly preempt RCW 81.53.295, which states:

> Whenever federal-aid highway funds are available and are used to pay a portion of the cost of installing a grade crossing protective device, and related work, at a railroad crossing of any state highway, city or town street, or county road at the then prevailing federal-aid matching rate, the grade crossing protective fund shall pay ten percent of the remaining cost of such installation and related work. The state or local authority having jurisdiction of such highway, street, or road shall pay the balance of the remaining cost of such installation and related work. The railroad whose road is crossed by the highway, street, or road shall thereafter pay the entire cost of maintaining the device.

RCW 81.53.295.

UPRR limits its challenge to the final sentence of the State statute requiring allocation of all maintenance costs to the railroad for any federal-aid funded project to install protective devices at highway-rail grade crossings. Dkt. No. 14 ¶ 4. UPRR further asserts in its second cause of action that the same FHWA regulations preempt the ALJ's order for the Commission allocating ongoing maintenance for the modified safety signals at issue in this case pursuant to the State statute. Dkt. No. 14 ¶¶ 17–23. UPRR admits that its second cause of action, claiming

1   that the Commission's order is also preempted by the same regulations, is wholly dependent on

2   RCW 81.53.295 being preempted. *Id.* ¶ 26. Defendants argue that the FHWA authorizing statutes

3   and regulatory scheme do not expressly preempt the maintenance allocation language included in

4   RCW 81.53.295. Dkt. No. 18 at 8–10; Dkt. No. 21 at 13–15.

5         Any express preemption analysis "'must in the first instance focus on the plain wording

6   of the clause, which necessarily contains the best evidence of [] pre-emptive intent.'" *In re*

7   *Volkswagen*, 959 F.3d 1211 (revision added) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S.

8   658, 664 (1993)).

9                 *a.      23 C.F.R. § 646.210(a)*

10        23 C.F.R. § 646.210(a) declares: "State laws requiring railroads to share in the cost of

11  work for the elimination of hazards at railroad-highway crossings shall not apply to Federal-aid

12  projects." By its plain language, the preemptive regulation only covers (1) state laws addressing

13  "work for the elimination of hazards at railroad-highway crossings" and (2) "Federal-aid

14  projects." 23 C.F.R. § 646.210(a).

15                (1)      Work for the elimination of hazards

16        UPRR argues that 23 C.F.R. § 646.210(a) preempts RCW 81.53.295—or more

17  specifically, its terminal sentence—because the FHWA intended it to restrict allocation of any

18  costs related to any project for the "elimination of hazards at railroad-highway crossings," which

19  it asserts extends beyond the construction phase of any such project and includes required

20  ongoing maintenance activities incidental to such projects. Dkt. No. 20 at 10. The Court is not

21  convinced that the regulation sweeps so broadly.

22        UPRR argues that any ongoing maintenance required for the modified signals after

23  installation is inherently "work for the elimination of hazards at railroad-highway crossings" as

24  used in the regulation. Dkt. No. 20 at 10–11; *see also* 23 C.F.R. § 646.210(a). This argument

fails for multiple reasons. First, Congress chose to provide a separate definition for maintenance (23 U.S.C. § 101(a)(13)) that does not mirror the "elimination of hazards" language used in the construction definition (23 U.S.C. § 101(a)(4)(E)), and specifies that the term "maintenance" as used in the statute is for "any project *constructed* under the provisions of this chapter." 23 U.S.C. § 116(b)(emphasis added).[5] The agency, in turn, chose not to separately define maintenance in the relevant section of the regulations, instead only defining and addressing construction. Second, read in the context of the comprehensive regulatory and statutory scheme, the preemptive regulation specifically relates back to the statutory definition of construction, not maintenance. The FHWA used the term "elimination of hazards of railway-highway grade crossings" in the regulations (23 C.F.R. § 646.206(a) and 23 C.F.R. § 646.210(a)), which is expressly used as a term identifying a project as included in the definition of construction (23 U.S.C. § 101(a)(4)(E)).[6] Finally, the agency clarified the definition of construction in the relevant section of the regulations to "mean the *actual physical construction* to improve or eliminate a railroad-highway grade crossing or accomplish other railroad involved work." 23 C.F.R. § 646.204 (emphasis added).

UPRR points out that the statutory definitions for both construction and maintenance use the term "preservation." Dkt. No. 20 at 11 (comparing 23 U.S.C. § 101(a)(4)(B) to § 101(a)(13)). But this does not save the day for UPRR. The Merriam-Webster dictionary defines "preservation" as "the activity or process of keeping something valued . . . intact, or free from damage or decay." Preservation, Merriam-Webster, https://www.merriam-

---

[5] The use of the past tense signifies the construction is completed, which contradicts UPRR's assertion that Congress intended for ongoing maintenance to be considered a component of federal-aid construction projects.

[6] While cited in support of their implied preemption argument, UPRR relies on *CSX Transp. Inc.*, which held that the language of 23 C.F.R. § 646.210(a) "could not be more clear. It means, very simply, that once a state or local government agrees to the federal funding of a railroad crossing *construction or reconstruction* project, it cannot seek to impose the cost of that project upon the railroad." 759 F. Supp. at 284 (emphasis added).

webster.com/dictionary/preservation (last visited August 18, 2023). This definition describes a broad range of activities that could be categorized as either construction or maintenance activities. As used in the statutory definition of construction, the term "preservation" is given more specific context by the other terms listed along with it—*i.e.*, "reconstruction, resurfacing, restoration, [and] rehabilitation"—which indicate activities related to the "actual physical" building phase of a project. 23 U.S.C. § 101(a)(4)(B); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) (describing "the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated"). The statutes then go on to specify that "the entire cost of *construction* of projects for the elimination of hazards of railway-highway crossings" is eligible for federal-aid funding, but do not include a similar provision for maintenance costs. 23 U.S.C. § 130(a) (emphasis added). The use of the word "construction" here implies a distinction between the preservation activities that may be considered part of the definition of construction, and those that may be considered maintenance activities. This distinction is supported by the fact that not all maintenance activities, even if they are for "the preservation of . . . such traffic-control devices as are necessary for safe and efficient utilization of the highway" (23 U.S.C. § 101(a)(13)), are eligible for federal-aid funding. *See id.* §§ 116(b), (e); *see also* Dkt. No. 29 at 6. Therefore, the Court finds that the term "work for the elimination of hazards at railroad-highway crossings" does not expressly preempt the state statute with regard to the allocation of maintenance costs.

(2)   <u>Federal-aid projects</u>

Even if "work for the elimination of hazards" could somehow be interpreted to include maintenance work, UPRR's argument would fail here because the type of maintenance work contemplated is not eligible for federal aid. "Federal-aid projects" are projects that are actually paid for using federal funds. 23 C.F.R. § 646.210(a). A "project" is defined by the governing

statutes as "any undertaking eligible for [federal highway-aid funds]" under the FHWA

implementing statutes. 23 U.S.C. § 101(a)(20). Maintenance work that is eligible for federal aid

is limited to instances where "the State demonstrates to the satisfaction of the Secretary that the

[preventative maintenance] activity is a cost-effective means of extending the useful life of a

Federal-aid highway." 23 U.S.C. 116(e). However, FHWA guidance makes clear that federal-aid

funds are not intended to be used to perform routine maintenance.[7] Dkt. No. 29 at 6

("Question 3: May a State transportation department use Federal-aid funds to perform routine

maintenance? Answer 3: No."). The maintenance costs in dispute here are intended to cover

"[m]onthly maintenance inspections . . . . electricity, ordinary scheduled and unscheduled

maintenance and repair work, and technology upgrades. These fees do not cover extraordinary

work and major replacements, rehabilitations, or rearrangements." Dkt. No. 14-4 at 5. But the

FHWA deems these types of routine maintenance activities ineligible for federal-aid funds. Dkt.

No. 29 at 6 (defining routine maintenance as "work that is performed in reaction to an event,

season, or over all deterioration of the transportation asset. . . . requir[ing] regular reoccurring

attention"). Therefore, the maintenance fees allocated to UPRR here cannot be said to be part of

the Federal-aid project, since they are ineligible for federal-aid funding.

Finally, UPRR argues that when construction of a Federal-aid project requires use of

railroad properties, a state must enter a written agreement with the railroad that addresses

"responsibility" for maintenance activities. Dkt. No. 20 at 10 (citing 23 C.F.R.

§ 646.216(d)(2)(viii)). But this does not mean the preemptive language of 23 C.F.R. § 646.210(a)

was intended to encompass maintenance "costs" associated with those activities. There is no

---

[7] Courts "may properly resort to an agency's interpretations and opinions for guidance, as they constitute a body of experience and informed judgment." *Hernandez v. Garland*, 38 F.4th 785, 789 (9th Cir. 2022) (quoting *Orellana v. Barr*, 967 F.3d 927, 934 (9th Cir. 2020)); *see also Nacarino v. Kashi Co.*, No. 22-15377, 2023 WL 5192559, at *8 (9th Cir. Aug. 14, 2023).

doubt that the agency is granted authority to define the *types* of projects eligible to receive federal-aid funds (i.e., "Federal-aid projects"). 23 U.S.C. § 130(b). But the specific provision in the implementing federal statutes that makes federal funds available for highway-rail grade projects expressly utilizes the permissive verb "may," as opposed to the proscriptive verb "shall." 23 U.S.C. § 130 ("[T]he entire cost of construction of projects for the elimination of hazards of railway-highway crossings . . . **may** be paid from sums apportioned in accordance with . . . this title." (emphasis added)). In other words, while federal funds under the FHWA statutes and regulations can only be utilized for projects that meet certain criteria as defined by the agency, states are free to define the scope of the projects for which they seek federal funding as they see fit.

Here, the City and UPRR appeared to agree on the scope of the maintenance activities that would be required and that the railroad would assume responsibility for ensuring that the activities were routinely carried out; they simply disagreed on who should bear the cost of those activities.[8] Dkt. No. 14-2 ¶¶ 13–14, 55; Dkt. No. 14-4 at 5–6. Because of the disagreement, the City sought the State's approval and funding for the construction portion of the project. Dkt. No. 14-2 ¶ 1. As noted by the ALJ, the State has determined that such requests shall be governed by RCW 81.53.271, which states that for "the installation of a grade crossing protective device, [where] a federal-aid funding program is available to participate in the costs of such installation, installation and maintenance costs of the device shall be apportioned in accordance with the provisions of RCW 81.53.295." This represents the State legislature's determination regarding the appropriate scope of such projects that will be submitted for federal funding when eligible.

---

[8] The Court acknowledges that the maintenance-cost related dispute kept the Parties from executing the agreement, but the facts do at least indicate an initial meeting of the minds as to the scope and responsibility for performance of the contemplated routine maintenance activities. Dkt. No. 14-2 ¶¶ 13–14, 55; Dkt. No. 14-4 at 5–6

Neither Party appears to dispute that the installation project itself is eligible for federal-aid funding as ordered by the ALJ pursuant to RCW 81.53.271 and RCW 81.53.295. But because ongoing maintenance as contemplated here is not eligible for funding as part of the Federal-aid project (23 U.S.C. §§ 116(b), (e)), and because none of the installation related costs included in the Federal-aid project are allocated to the railroad by RCW 81.53.295, the Court cannot find that 23 C.F.R. § 646.210(a) expressly preempts the State statute, despite the Parties' failure to agree on who should bear the costs for ongoing "maintenance responsibilities" as contemplated by 23 C.F.R. § 646.216(d)(2)(viii).

### b.  23 C.F.R. § 646.210(b)(1)

Unlike 23 C.F.R. § 646.210(a), the plain wording of § 646.210(b)(1) does not explicitly express an intent to preempt any specific state laws. *Compare* § 646.210(b)(1) ("Projects for grade crossing improvements are deemed to be of no ascertainable net benefit to the railroads and there shall be no required railroad share of the costs.") *with* 23 C.F.R. § 646.210(a) ("*State laws* requiring railroads to share in the cost of work for the elimination of hazards at railroad-highway crossings *shall not apply* to Federal-aid projects." (emphasis added)). In isolation, the federal regulatory language could be read as prohibiting the State's cost allocation provision, but it would be improper to infer specific preemptive intent from such broadly proscriptive language. *See, e.g. Kansas v. Garcia*, 140 S. Ct. 791, 802 (2020) ("The Kansas Supreme Court . . . base[d] its holding on . . . [8 U.S.C.] § 1324a(b)(5), which . . . . unlike a typical preemption provision, [could broadly] appl[y] not just to the States but also to the Federal Government and all private actors."). UPRR's arguments to the contrary are unavailing because it asks the Court to *imply* the preemptive force of the regulation to the State statute by cherry picking definitions for terms used in the regulatory statement from other parts of the regulations and authorizing statutes (*see*

Dkt. No. 20 at 14), which exceeds the scope of the express preemption analysis at this stage.[9] *See Ass'n des Éleveurs*, 33 F.4th at 1114 (holding that express preemption occurs when the text of a federal statute or regulation itself "explicitly manifests [an] intent to displace state law"). As such, the Court finds that UPRR does not make an express preemption argument but instead makes an implied preemption argument for 23 C.F.R. § 646.210(b)(1), which will be addressed in the next section. *See infra* Section III.A.2.b.

2.   **Implied Preemption**

UPRR contends that even if the language of 23 C.F.R. § 646.210 does not expressly prohibit the maintenance cost allocation provision of RCW 81.53.295, the regulations "at least impliedly preempt" the State from imposing the maintenance costs at issue. Dkt. No. 20 at 14. UPRR notes that federal regulations can impliedly preempt a state law to the extent the law "'conflicts with [them] or frustrates the[ir] purposes,' including any law that 'stand[s] as an obstacle' to the agency's 'full purposes and objectives.'" *Id.* (quoting *Cohen*, 46 F.4th at 1028 (revisions in original)). Defendants argue that the FHWA authorizing statutes and regulatory scheme do not impliedly preempt the maintenance allocation language included in RCW 81.53.295. Dkt. No. 18 at 8–10; Dkt. No. 21 at 6–12.

A "high threshold must be met before a court will conclude that a federal law has impliedly preempted state law." *In re Volkswagen*, 959 F.3d at 1212 (internal quotation marks omitted) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)). The Court's analysis must "'start with the assumption that the historic police powers of the States' are not preempted 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Wyeth v.*

---

[9] In contrast, the plain wording of 23 C.F.R. § 646.210(a) itself expressed a clear preemptive intent, and the Court looked beyond the wording only to determine whether the challenged state statute fell within the bounds of laws intended to be displaced by the regulation. *See supra* Section III.A.1.a.

*Levine*, 555 U.S. 555, 565 (2009)). Where there is a dual federal-state regulatory scheme in place, the preemption analysis must "be applied sensitively" to avoid displacing the role Congress intended to be reserved to the states. *MetroPCS*, 970 F.3d at 1118.

### a.   Purposes and Objectives of FHWA

Ensuring safety at rail grade crossings, even at the expense of the railroads, has always been within the historic police powers of the states. *See Lehigh Valley R. Co. v. Bd. of Pub. Util. Comm'rs*, 278 U.S. 24, 34 (1928) ("[W]here railroad companies occupy lands in the state for use in commerce, the state has a constitutional right to insist that a highway crossing shall not be dangerous to the public, and that, where reasonable safety of the public requires abolition of [dangerous conditions], the railroad cannot prevent the exercise of the police power to this end by the excuse that such change would . . . lead to the bankruptcy of the railroad.") (citing *Erie R. Co. v. Bd. of Pub. Util. Comm'rs*, 254 U.S. 394 (1921)).

The FHWA was initially established by Congress for the express purpose of expediting the completion of the federal interstate highway system and later reauthorized to ensure that the usefulness of the system is preserved into the future. 23 U.S.C. § 101(b). To accomplish this, Congress has created a dual federal-state regulatory scheme that makes federally appropriated funds available to the individual states for highway related construction and improvement projects in a streamlined and efficient process. *See id.* §§ 104, 106. There is some indication that Congress was conscious of not allowing a state to game the system by using its police powers to seek reimbursement from railroads for rail grade projects funded through the federal program. S*ee, e.g.*, 23 U.S.C. § 130. But it is also clear that Congress never intended to fully usurp the states' traditional role in maintaining safety at rail grade crossings as it left the duty to "maintain[] or cause to be maintained" construction projects with the states. *See* 23 U.S.C. § 116 ("It shall be the duty of the State transportation department or other direct recipient to maintain,

*or cause to be maintained*, any project constructed under the provisions of this chapter or constructed under the provisions of prior Acts." (emphasis added)).

UPRR's conflict preemption argument appears to rely almost entirely on a presumption that Congress's primary purpose in enacting the FHWA statutes and regulations was to "reliev[e] railroads of the costs of [Federal-aid] projects." Dkt. No. 20 at 14. To support this contention, UPRR relies solely on the following quote from a 30-year-old out-of-circuit district court case: "'Congress was fully aware of the general purpose of the [Federal-Aid Highway] Act to relieve railroads of the burden of paying for the improvements of crossings.'" *Id.* (revisions in original) (quoting *CSX Transp., Inc. v. Mayor & City Council of Baltimore City, Md.* (hereinafter "*CSX*"), 759 F. Supp. 281, 284 (D. Md. 1991), *aff'd*, 979 F.2d 356 (4th Cir. 1992)). The Court is not bound by the Maryland District Court's interpretation of the relevant statutes and regulations. Nonetheless, *CSX* is readily distinguishable, as it entailed an attempt by a city government to invoke the "second comer" doctrine to allocate costs to the railroad for a portion of a project that was actually federally funded. *See CSX*, 759 F. Supp at 285 (rejecting application of the doctrine to Federal-aid projects as "nonsensical" and concluding that "it is obvious that to permit a state or local government to first receive federal funding for a project, and then to obtain like reimbursement from a railroad for the cost of the same project would be to provide a windfall to the state or local government"). Not only does the present case not invoke the "second comer" doctrine, but no such potential windfall to the State is at issue here, since the federally funded portion of the project is limited to costs related to the installation of the safety devices, none of which may be allocated to the railroad per the express language of RCW 81.53.295. In other words, RCW 81.53.295 explicitly avoids frustrating the congressional purpose of the FHWA statutes and regulations that the district court recognized in *CSX*.

1

**b.      23 C.F.R. § 646.210(b)(1)**

2       UPRR would have the Court imply a preemptive intent directly from the language of the

3 regulation, without fully considering the context of the regulation's placement within the

4 structure of the regulatory scheme. Dkt. No. 20 at 10. The Court instead reads the text of

5 subsection (b)(1) in conjunction with the introductory text of section (b): "Pursuant to 23 U.S.C.

6 § 130(b): . . . ." *See* 23 C.F.R. 646.210(b). As such, the plain meaning of subsection (b)(1) is

7 cabined and contextualized by 23 U.S.C. § 130. There, Congress expressly authorized the agency

8 to determine "a percentage of the costs of *construction* which shall be deemed to represent the

9 net benefit to the railroad or railroads for the purpose of determining the railroad's share." 23

10 U.S.C. § 130(b) (emphasis added). So again, the regulation is in the context of construction, not

11 maintenance. *See supra* Section III.A.1.a.(1). Further, UPRR again reads the statutory provision

12 without considering its context within the statutory scheme. Although subsection (b)(1) of the

13 regulation specifically refers back to 23 U.S.C. § 130(b), the ensuing subsection 130(c) clarifies

14 that the agency's determination was intended to limit the extent to which a railroad may be

15 required to reimburse "*the United States* for the net benefit" of any federally funded project for

16 the elimination of highway-rail grade hazards. *Id.* § 130(c) (emphasis added); *see also CSX*, 759

17 F. Supp. at 284 ("[T]he purpose of this section is to direct the FHWA itself to refrain from

18 seeking reimbursement from a railroad."). Nowhere in the implementing statutes does Congress

19 express the intent to limit *the states* from determining for themselves the net benefit to the

20 railroad, or any other potential benefactor, for project costs *not* covered by federal-aid funds.

21       As previously discussed, routine maintenance activities, such as those at issue here, are

22 not eligible for federal-aid funding. *See supra* Section III.A.1.a.(2). Thus, the FHWA statutes and

23 regulations fall far short of overcoming the strong assumption that the states' historic police

24

1   powers are not preempted without a "clear and manifest" congressional purpose. *In re*

2   *Volkswagen*, 959 F.3d at 1212 (internal quotation marks and citations omitted).

3          At oral argument, the Parties agreed that the intent and authority elements of the

4   preemption analysis were disjunctive, and that the Court need not address authority if it finds that

5   there is no evidence of intent to preempt the statutory provision in question. *See also Fidelity*

6   *Fed. Sav. & Loan Ass'n*, 458 U.S. at 154 (describing the preemption analysis as "rest[ing on]

7   whether the Board meant to pre-empt . . . , and, if so, whether that action is within the scope of

8   the Board's delegated authority"). Here, the Court finds that 23 C.F.R. § 646.210 neither

9   expressly nor impliedly manifests an intent to preempt the provision of RCW 81.53.295 that

10  allocates to the railroad routine maintenance costs for grade crossing protective devices installed

11  using federal aid. Therefore, the Court need not address the scope of FHWA's authority. The

12  Court thus finds that UPRR's preemption claims fail as a matter of law.

13  **B.     RCW 81.53.295 Does Not Violate Due Process**

14         UPRR's third cause of action in the FAC asserts that "RCW 81.53.295's last sentence,

15  either facially or as applied by the Commission[], violates the Due Process Clause." Dkt. No. 14

16  ¶ 35. Defendants argue that binding Supreme Court precedent precludes finding RCW 81.53.295,

17  or the ALJ's order implementing the statue, violate due process. Dkt. No. 18 at 11 (citing *Lehigh*

18  *Valley*, 278 U.S. at 35, and *Atchison, T. & S. F. Ry. Co. v. Pub. Utilities Comm'n of Cal.*, 346

19  U.S. 346, 353 (1953)). The Parties appear to agree that states "generally enjoy substantial leeway

20  to allocate the costs of public-crossing projects," but such allocation must not be arbitrary or

21  unreasonable. Dkt. No. 20 at 16 (citing *Nashville, Chattanooga & St. Louis Ry. v. Walters*, 294

22  U.S. 405, 415 (1935)); *see also* Dkt. No. 21 at 15 (same).

23         UPRR asserts that the final sentence of the State statute is facially arbitrary and

24  unreasonable because it requires allocation of all maintenance costs without consideration of

1   case-specific facts and prohibits the possibility of allocating less than 100 percent of the

2   maintenance costs. Dkt. No. 20 at 16–19. It also alleges that the ALJ's order was arbitrary or

3   unreasonable as applied to the case-specific facts offered by UPRR at the hearing. *Id.*

4         1.   **RCW 81.53.295 Does Not Facially Violate Due Process**

5         UPRR's facial due process arguments appear to rest on the misconception that

6   RCW 81.53.295 allows the Commission to require the railroad to pay all maintenance costs "in

7   every case, without providing any opportunity to prove case-specific facts . . . ." *Id.* at 17. This is

8   simply not true. UPRR seems to ask the Court to read this single sentence excised from its

9   context.

10        But RCW 81.53.295 resides within a comprehensive regulatory scheme put into place by

11   the State, presumably to ensure due process in its implementation. *See generally* RCW 81.53 *et*

12   *seq.* Pursuant to this regulatory scheme, before maintenance costs for installed safety devices at

13   rail grade crossings can be imposed on the railroad: (1) the installation of the devices must be

14   part of a project for which federal-aid funding will be sought (RCW 81.53.271); (2) the

15   installation project must be deemed necessary "from the standpoint of public safety" (*id.*); (3) the

16   railroad must be given notice and an opportunity to challenge the public safety rationale for the

17   project in a quasi-judicial hearing (RCW 81.53.261); and (4) 100 percent of the costs for

18   installing the safety devices must be funded using federal-aid allocated for the construction

19   portion of the project per the FHWA dual federal-state regulatory scheme (RCW 81.53.295), in

20   other words, at no cost to UPRR. Even then, the regulatory scheme provides ample opportunity

21   for the railroad to seek both administrative and judicial review of the agency's determination that

22   the project is necessary for public safety. *See, e.g.*, RCW 81.53.150; RCW 81.53.261;

23   RCW 81.53.170; RCW 80.01.060; WAC 480-07-825; WAC 480-07-830. This regulatory

24   scheme provides sufficient due process to protect UPRR from the arbitrary and unreasonable

1    application of the maintenance cost allocation provision of RCW 81.53.295.[10] For this reason,

2    UPRR's facial due process challenge to the State statute fails as a matter of law.

3              2.       **The ALJ's Order Does Not Facially Violate Due Process**

4              UPRR's own asserted facts also preclude the Court from finding that the ALJ's order

5    implementing RCW 81.53.295 is facially arbitrary. Unlike the facial due process challenge to the

6    implementing statute that UPRR raised at the hearing, the ALJ was authorized to and did hear

7    the parties' arguments regarding the public safety necessity of the modified safety devices. *See*

8    Dkt. No. 14-2. The only facts that UPRR asserts in the FAC for its claim that the ALJ's

9    conclusion was reached arbitrarily is that it submitted evidence and arguments at the hearing to

10   refute the City's public safety rationale, and that "[t]he Commission acted arbitrarily by failing to

11   consider [UPRR's] points." Dkt. No. 14 ¶¶ 16, 34. As an initial matter, the Court need not accept

12   the assertion that the Commission acted arbitrarily as true because that is a legal conclusion.

13   *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

14             Further, the exhibits UPRR chose to include as part of its FAC directly refute the

15   allegation that the ALJ failed to consider UPRR's evidence. *See* Dkt. No. 14-2 ¶¶ 41–48, 61

16   (citing evidence and arguments presented by the City, independent Commission staff, and UPRR

17   during the hearing and in post-hearing briefing and noting in its final findings and conclusions

18   that "*the unrebutted record evidence* demonstrates that public safety requires the modification of

19   signals or warning devices" (emphasis added)). Based on these findings, the ALJ concluded that

20   RCW 81.53.295 applied. Dkt. No. 14-2 ¶¶ 52, 56. As the Court has found that the statute does

21

22

23   _____

     [10] Although the Court comes to this conclusion upon its own independent review of the relevant statutes and
     regulations, the Court recognizes that it appears to comport with the decision reached by its sister court in the

24   Eastern District of Washington per the supplemental authority provided by Defendants. *See* Dkt. No. 22 at 8.

1    not facially violate due process, the fact that UPRR disagrees with the ALJ's conclusion is

2    insufficient to support the claim that the ALJ's order is constitutionally deficient on its face.

3         3.    **Supreme Court and Other Due Process Cases**

4         UPRR misconstrues Supreme Court and out-of-circuit precedents to argue that due

5    process always prohibits a state from proscriptively allocating to the railroad a fixed percentage

6    of costs for public safety projects at rail grade crossings. Dkt. No. 14 ¶ 33 (citing *Walters*, 294

7    U.S. 416, and *City of Gainesville v. S. Ry. Co.*, 423 F.2d 588, 591 (5th Cir. 1970)). UPRR

8    contends that due process requires the State to always determine the allocation percentage on a

9    case-by-case basis and any statute to the contrary is facially deficient. *Id.*; *see also* Dkt. No. 20

10   at 17. Thus, UPRR concludes that RCW 81.53.295 is facially arbitrary to the extent it required

11   the ALJ to order the railroad to pay for all ongoing maintenance costs upon determining that the

12   project was necessary for public safety. The Supreme Court announced no such rule in *Walters*,

13   and *Gainsville*—in addition to not being binding on this Court—is distinguishable on the facts

14   and posture of the case.

15        As an initial matter, the *Walters* Court did not find that "due process was violated" by the

16   challenged statute requiring a 50-percent cost allocation to the railroad, as implied by UPRR.

17   Dkt. No. 20 at 17. Instead, the *Walters* Court merely remanded the due process question back to

18   the Tennessee Supreme Court because it did not appropriately consider all of the relevant facts

19   presented through the "arbitrary and unreasonable" standard announced for the first time in that

20   case. 294 U.S. at 432–33 (noting that "[w]e have no occasion to consider now whether the facts

21   presented by the railway were of such persuasiveness as to have required the state court to hold

22   that the statute and order complained of are arbitrary and unreasonable"). Nothing in *Walters*

23   requires the conclusion that state statutes that set a fixed allocation percentage for railroad grade

24   project costs violate due process.

The posture of the case in *Gainsville*, as well as the distinguishing factors of the challenged law, preclude its application in this case. The court in *Gainesville* noted that the due process challenge there was "solely an attack on a local ordinance and action of local officials not upon a state statute of general application or against state officials carrying out a state statute or policy of general application." 423 F.2d at 589. There, the city ordinance in question required the railroad "to install and maintain entirely at its own expense automatic signaling devices where [the railroad's] main line tracks intersect with [a city street]." *Id.* The city filed suit in federal court to compel the railroad to install and maintain devices at a rail grade crossing in the city pursuant to the ordinance that had previously only included passive warning signs but no automatic signaling devices. *Id.* The railroad countersued, raising a due process challenge to the ordinance. *Id.* After determining that the "ordinance was enacted not pursuant to [a] Georgia Statute but under [the city's] inherent police power as is clearly authorized by the Georgia courts," the district court convened a hearing and relied on an earlier Fifth Circuit case to conclude that such an ordinance was constitutional. *Id.* at 589–90 (discussing the district court's reliance on *Seaboard Air Line R. Co. v. City of W. Palm Beach, Fla.*, 373 F.2d 328 (5th Cir. 1967)). The Fifth Circuit remanded the case back to the district court because of its reliance on distinguishable precedent noting that it had failed to "make a finding as to the reasonableness of the allocation of costs in installing and maintaining the signal devices *as to this particular case*." *Id.* at 591 (emphasis added).

*Gainsville* is easily distinguishable on its facts as well. There, the Fifth Circuit instructed the district court to consider "[t]he elements of reasonableness and fairness in the allocation of costs" imposed by the city ordinance under the specific circumstances of that case in the first instance, because there were no other due process safeguards in place for the implementation of the ordinance. *Id.* at 589–91. Unlike the ordinance in *Gainsville*, here the State's regulatory

1    scheme, as already discussed in this Order, provides sufficient process to avoid its arbitrary

2    application, and the railroad was given an opportunity to present its evidence regarding the

3    reasonableness of imposing the statutory allocation under the specific circumstances of this case.

4       **4.**  **RCW 81.53.295 Was Not Arbitrarily Applied**

5       In finding that RCW 81.53.295 and the ALJ's order are not facially arbitrary as a matter

6    of law (*see supra* Section III.B.1), the Court cannot now say that the ALJ's decision to enforce

7    the statutory allocation provision was arbitrary and, therefore, violated the Due Process Clause

8    based on the factual allegations included in UPRR's FAC. The ALJ considered UPRR's

9    proposed facts in concluding that since the State "statute[] clearly appl[ies] to the facts of this

10   case . . . . [t]he Commission may not depart from the statute's clear requirements." Dkt. No. 14-2

11   ¶¶ 52, 56. Again relying on *Gainesville*, UPRR appears to be challenging the ALJ's

12   determination that the project was necessary from a public safety perspective as constitutionally

13   deficient because the ALJ was constrained by the provisions of the State's regulatory scheme and

14   implementing statutes from also considering whether the allocation of maintenance costs was

15   reasonable and fair in light of all of the facts presented. Dkt. No. 20 at 17–18 ("Due process

16   requires considering 'the reasonableness of the allocation of costs in installing and maintaining

17   the signal devices [in each] particular case.'" (quoting 423 F.2d at 591)); *see also Walters*, 294

18   U.S. at 415 ("The police power is subject to the constitutional limitation that it may not be

19   exerted arbitrarily or unreasonably.").

20      In particular, UPRR argues that the ALJ failed to consider the extent to which the

21   changes to the rail-grade crossing as part of the Barker Road project would impact the rail grade

22   itself, in terms of degradation of the track surface due to increased traffic volumes and a "likely"

23   decrease in unspecified commercial opportunities for the railroad. Dkt. No. 20 at 18. UPRR's

24   primary argument is that the overall project provides more benefits to the City than it does to the

railroad, and thus it would be unreasonable and unfair for the railroad to bear any costs for the project whatsoever. *Id.* Consequently, UPRR's claim rests on the implication that the ALJ's decision must have been reached arbitrarily because the ALJ was prohibited by RCW 81.53.295 from considering UPRR's facts; otherwise, the ALJ would have reached a conclusion other than imposing 100 percent of the maintenance cost per the statute. No such implication plausibly arises from the facts UPRR alleges in its FAC, even if taken as true.

UPRR's FAC alleges that "[t]he Commission acted arbitrarily by failing to consider these points" (Dkt. No. 14 ¶ 34), with "these points" being UPRR's evidence of the significant ongoing expense to it and that the project would primarily benefit road users rather than UPRR. *Id.* But there is no indication that the ALJ failed to consider or ignored the facts presented by UPRR at the administrative hearing. To the contrary, the ALJ's order highlights UPRR's facts *and* the counter-facts that were presented to rebut UPRR's implications of unfairness.[11] *See* Dkt. No. 14-2 ¶¶ 15–16, 30–31. The ALJ considered UPRR's facts and arguments in determining whether the safety devices were necessary for public safety knowing that such a finding would require it to impose the costs for maintaining the devices on the railroad. The ALJ was not statutorily required to make a specific determination as to whether the railroad benefited from the project with respect to the costs of maintenance or would be overburdened by the imposition of the maintenance costs.

The ALJ also noted the facts that traffic volumes at the crossing were already increasing, and those increases were projected to continue even if the City did not implement the Barker

---

[11] UPRR concedes that "[i]f Union Pacific alleged that the order said one thing but the exhibit said something else, then of course the Court would credit the exhibit." Dkt. No. 20 at 18. That is the situation at hand. UPRR claims the order is deficient because the ALJ failed to consider points it made at the hearing, but the order reflects the ALJ clearly considered them. *Compare* Dkt. No. 14 ¶ 34 *with* Dkt. No. 14-2 ¶¶ 15–16, 30–31. The Court, therefore, credits the fact that the ALJ clearly considered the arguments made by UPRR.

Road project (Dkt. No. 14-2 ¶¶ 16, 43, 47), and the diagnostic team meeting minutes indicated that "'there had been nine blocked crossings, 18 unsafe motorists, and one vehicle on the tracks reported at this location'" (*id.* ¶ 44).[12] UPRR does not dispute this evidence. In fact, it highlighted the underlying increase in traffic volume to argue before the ALJ that the City was not primarily motivated by public safety in pursuing the construction project. *See* Dkt. No. 14-2 ¶¶ 12, 27. The ALJ clearly considered UPRR's evidence in deciding that "UPRR did not effectively undermine the City's testimony on the issue of public safety. . . . The railroad cannot absolve itself of its duties under Washington law by pointing to increased traffic volumes as an underlying cause of safety concerns." Dkt. No. 14-2 ¶¶ 41–48. This determination is consistent with principles of due process. For example, the Supreme Court held in *Atchison* that the commission's decisions to allocate costs to the railroads for grade separation improvements "to meet local transportation needs and further safety and convenience, made necessary by the rapid growth of the communities" were not arbitrary or unreasonable, especially where the commission "considered all the evidence offered, including that going to benefits received," even though the commission was not required to consider such evidence. 346 U.S. at 354; *c.f. Walters*, 294 U.S. at 428–29 (noting that imposing costs on the railroad for the construction of a highway underpass at a grade crossing purely for the promotion of public convenience, *without an attending public safety concern*, was an unreasonable denial of due process (citing *Chicago, St. Paul, Minneapolis & Omaha Ry. Co. v. Holmberg*, 282 U.S. 162, 167 (1930))).

---

[12] The ALJ also acknowledged the City's concession that there had been no collisions at the Barker Road crossing over the last 25 years. Dkt. No. 14-2 ¶ 46. However, the ALJ accepted the Commission's assertion that "'[t]he lack of past accidents at a dangerous location is not a necessary predictor of future safety,'" and found that "[t]he City is therefore not required to establish that catastrophic collisions have already occurred at this crossing. To hold otherwise would suggest that lives are worth less than the funds spent on warning signs." *Id.* (citation omitted). The Court agrees.

Since the Court finds that the ALJ's decision to impose the maintenance costs was neither unreasonable nor arbitrary in light of all the facts alleged, the Court cannot find that UPRR has stated a plausible claim that the ALJ's order violated UPRR's due process rights as applied in this case.

## IV.   CONCLUSION

For these reasons, the Court FINDS that UPRR has failed to state a cognizable claim for relief on any of its three causes of action as a matter of law. The Court therefore GRANTS Defendants' motion to dismiss and DISMISSES this case in its entirety pursuant to FRCP 12(b)(6).

Dated this 8th day of September 2023.

Tana Lin
United States District Judge